Carolyn **PEACH**, Plaintiff–Appellant,

v.

**SMITH COUNTY, TENNESSEE; Johnny Bane, individually and in his official capacity as Sheriff of Smith County, Tennessee; L.B. McDonald,**

in his official capacity as Sergeant of Smith County, Tennessee; Guinn Gregory, individually and in his official capacity as Chief Deputy Sheriff of Smith County, Tennessee; and Donald Carr and wife Sue Carr, Defendants–Appellees.

No. 02–6194.

United States Court of Appeals, Sixth Circuit.

Feb. 17, 2004.

Richard M. Brooks, Carthage, TN, for Plaintiff–Appellant.

M. Bradley Gilmore, Joel P. Surber, Parker, Lawrence, Cantrell & Dean, Nashville, TN, for Defendants–Appellees.

Donald Carr, pro se, Carthage, TN, for Defendant–Appellee.

Sue Carr, pro se, Carthage, TN, for Defendant–Appellee.

Before: SUHRHEINRICH, CLAY and SUTTON, Circuit Judges.

SUTTON, Circuit Judge.

On July 29, 1999, police found Amanda Jean Westphal and her boyfriend Randy Carr dead at Carr's house in Carthage, Tennessee, which is located in Smith County. The police concluded that Carr had murdered Westphal, then taken his own life.

A year later, Westphal's mother, Carolyn Peach, filed this wrongful-death lawsuit, claiming that a series of other individuals (in addition to Randy Carr) were responsible for Westphal's death, most notably because Westphal had obtained an order of protection against Carr from the Circuit Court for Smith County a month and a half before her death. Filed in federal court, the lawsuit was brought against Smith County, several law-enforcement officers employed by Smith County and Randy Carr's parents. In the lawsuit, Peach alleged that the defendants had violated 42 U.S.C. §§ 1983 and 1985, the Fourth, Fifth and Fourteenth Amendments, as well as several state laws. The

district court granted defendants' summary judgment motion, and we affirm.

## I.

On June 7, 1999, Amanda Westphal obtained an assault warrant and ex parte order of protection against Randy Carr, who not only was her boyfriend but also was the father of her three children (all minors at the time). Her application for the assault warrant and protective order alleged that Carr had "choked [her] because [she] back[ ] talk[ed] him. Then, he hit [her] over and over in the arm and side. He pointed a gun to [her] head and told [her] that he should kill [her] right then." Pet. for Order of Prot. Later that day, Sergeant L.B. McDonald personally served Carr with the notice and order of protection before taking him into custody on the assault warrant. Carr was not carrying a weapon when he was arrested, and Sergeant McDonald did not notice a weapon in plain view when he took Carr into custody. One week later, on June 14, 1999, the Circuit Court for Smith County held a hearing and issued a permanent order of protection for Westphal against Carr.

Not long after these developments, Westphal asked Carr if she could borrow a car from him and if she could be covered again by his insurance policy. A few weeks later, in early to mid-July 1999, Carr and Westphal took a camping trip together in the mountains of Gatlinburg, Tennessee without their children. At some point later in July 1999, Carolyn Peach (Westphal's mother) called Chief Deputy Sheriff Gregory to advise him that Carr had a weapon in his jeep. Gregory informed her that it was not illegal to carry a weapon in a vehicle, and he did not investigate the matter further.

On July 28, 1999, Westphal and Carr spent the night at Westphal's apartment with their children. The next day, July 29, 1999, Westphal and Carr dropped their children off at Carr's parents' house, and claimed that they intended to spend the day shopping for their children's school clothes. Later that afternoon, police found Westphal and Carr dead at Carr's residence, victims of a murder-suicide committed by Carr.

On July 26, 2000, Peach filed a wrongful-death claim against (1) Smith County. Tennessee. (2) Sheriff Johnny Bane, Sergeant L.B. McDonald and Chief Deputy Sheriff Guin Gregory in their individual and official capacities and (3) Donald and Sue Carr, Randy Carr's parents. Her complaint sought compensatory and punitive damages under 42 U.S.C. §§ 1983 and 1985 and the Fourth, Fifth and Fourteenth Amendments, as well as under an assortment of state laws. The complaint contained two essential theories of liability—that the defendants had a duty to protect Amanda Westphal after the issuance of the protective order against Randy Carr and that Sergeant McDonald could have prevented the murder by searching for, and seizing, any weapons Randy Carr had when he was arrested on June 7, 1999.

On October 13, 2000, the parties agreed to have a Magistrate Judge preside over the case under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b). The case was assigned to Magistrate Judge Knowles.

During discovery, documents produced by the Smith County defendants established that Carr had purchased the murder weapon on June 21.1999. some two weeks after McDonald had served him with the assault warrant and order of protection. As part of the weapon purchase, these documents also showed. Carr had completed and executed a Firearms Transaction Record, which included the following question: "Are you subject to a Court

order restraining you from harassing. stalking, or threatening an intimate partner or child of such partner?" In response, Carr had written "No." Firearms Trans. Rec. Pt. 1. He then was permitted to buy the weapon.

On March 3, 2001, the Smith County defendants (but not Donald and Sue Carr) moved for summary judgment. In granting the motion, the district court observed that *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), establishes that the Due Process Clause generally does not impose an affirmative duty on state and local governments to protect their citizens from private acts of violence. Nor, the district court added, did either of the two narrow exceptions to the *DeShaney* rule apply in this instance. First, plaintiff did not show that the Smith County defendants had a "special relationship" with Westphal, which would trigger a duty to protect her from Carr. As the court observed, this exception would apply only if Westphal had been in state custody when the murder-suicide occurred. *See DeShaney,* 489 U.S. at 200 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him. but from the limitation which it has imposed on his freedom to act on his own behalf.").

Second, Peach failed to show that the Smith County defendants had caused the risk of danger to Westphal. *See DeShaney,* 489 U.S. at 201 ("While the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."); *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998) ("[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts."). This exception to the *DeShaney* rule. the court concluded, did not apply for several reasons. One, plaintiff at most was challenging omissions by the Smith County defendants–not affirmative acts. Two, even if the Smith County defendants had seized all weapons that Carr possessed on June 7, 1999 (when McDonald arrested him), they could not have seized the murder weapon because it was not purchased until two weeks later. Three, while Peach claimed that Carr was able to purchase the murder weapon because the Smith County defendants did not enter the order of protection against him into the Tennessee Crime Information System, she offered no evidence to support this theory of liability.

The district court also rejected plaintiff's other claims. It determined that Peach had not presented sufficient evidence to make out a prima facie claim of liability under § 1985. It determined that Peach never explained her theory of liability under the Fourth and Fifth Amendments. And, in the absence of a cognizable federal claim, the district court determined that the pendent state law claims should be dismissed.

On August 22, 2002, plaintiff voluntarily dismissed Donald and Sue Carr from the lawsuit and filed this appeal. On appeal, Peach has pursued only her § 1983 due process claim.

## II.

The customary rules for reviewing a summary-judgment decision apply. We

give de novo review to the district court's decision. *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir.2002). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). And in considering such motions, we give all reasonable factual inferences to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Different theories of liability apply to the various defendants in this case. Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a local government (like Smith County) may be held monetarily liable for violating federally protected rights under § 1983 only where a "policy or custom [of the county] ... inflicts the injury." *Id.* at 694. Likewise, under *Monell*, § 1983 claims for money damages against government officials sued in their official capacities (like some of the claims against Bane and Gregory and all of the claims against McDonald) are treated as claims against the municipality and therefore require actions in accordance with an unconstitutional municipal policy. *See id.* at 690 n. 55. Finally, § 1983 claims for money damages against government officials in their individual capacities (like some of the claims against Bane and Gregory) require proof that the officers violated federally protected rights and, to the extent a defense of qualified immunity is asserted, that those rights were clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). All three theories of liability share an initial requirement–that the defendants violated a federally-protected right. As that requirement has not been satisfied here. Peach's claims all fail as a matter of law.

After the district court's decision, this Court decided *Jones v. Union County*, 296 F.3d 417 (6th Cir.2002), a decision that re-enforces the district court's interpretation of *DeShaney* and makes clear that Peach's due process claim is not a tenable one. In *Jones*, the plaintiff sued the sheriff's department under 42 U.S.C. § 1983, alleging that the department had violated her Fourteenth Amendment rights when it failed to serve her ex-husband with an ex parte order of protection, after which he broke into her house and shot her.

The *Jones* claimant first invoked *DeShaney's* "special relationship" exception, arguing that it applied due to the existence of an ex parte order of protection. *Jones*, 296 F.3d at 428. Disagreeing, we explained that "the 'special relationship' exception in the due process context has been limited to situations in which the state affirmatively acts to restrain an individual to act for himself or herself"–as for example when an individual is placed in custody. *Id.* at 430. The existence of an ex parte order of protection, we concluded, did not suffice to show such a custodial relationship. *See id.*

The *Jones* claimant next invoked *DeShaney's* "state-created danger" exception, contending that Union County created or at least enhanced the danger to her by failing to serve the ex parte order of protection on her ex-husband in a timely fashion. In response, we noted that "[l]iability under the state-created danger theory must be predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger." 296 F.3d at 430 (quoting *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir.1995)) (internal quotations omitted). That showing has not been established, we concluded, because the plaintiff had merely shown a failure to act in relation to the ex

parte order of protection. *See Jones,* 296 F.3d at 431.

Today's case parallels *Jones* in many respects. As in *Jones,* the ex parte order of protection by itself did not establish a special relationship between the Smith County defendants and Westphal. Neither Westphal nor Carr was in state custody at the time of the murder-suicide, and the Smith County defendants never affirmatively undertook a duty to protect Westphal from Carr. And, as in *Jones,* no evidence exists that the Smith County defendants' actions created the danger at issue. While Sergeant McDonald failed to seize Carr's weapons when he arrested Carr, the murder weapon was purchased some two weeks later–eliminating any causal connection between the alleged failure to seize weapons on June 7, 1999 and the murder on July 29, 1999. Nothing in the record, moreover, shows that the Smith County defendants failed to enter Westphal's order of protection against Carr into the state criminal information system, or that its entry in the system would have prevented Carr from buying the murder weapon.

Finally, it was Westphal who independently and voluntarily chose to visit, camp with and stay with Carr after the County issued the order of protection. No claim has been made that the Smith County defendants had any knowledge of this decision by Westphal or for that matter any control over it. This undisputed fact also serves to break any alleged link between the murder and the actions of the Smith County defendants. *See Summar ex rel. Summar v. Bennett,* 157 F.3d 1054, 1059 n. 2 (6th Cir.1998) (noting that a decedent's voluntary decisions to become a confidential informant and to fraternize with criminals, not an officer's act to assist the district attorney in preparing an indictment, created the risk of danger); *see also*

*Weeks v. Portage County Executive Offices,* 235 F.3d 275, 279 (6th Cir.2000) (determining there was no due process deprivation when the victim was not in police custody and the actions of the police did not cause him harm).

### III.

Having heard oral argument, having studied the record on appeal, and having considered our recent decision in *Jones,* we are convinced that the district court properly granted summary judgment in favor of the Smith County defendants. Accordingly, we affirm.